*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 12-FM-69, 12-FM-235, 12-FM-386, 12-FM-560, & 12-FM-971

LORI A. SAXON, APPELLANT,

v.

TODD D. ZIRKLE, APPELLEE,

and

JANE KHOURY and OLIVIA BAKER, APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(DRB-3424-09)

(Hon. Jeanette J. Clark, Trial Judge)

(Argued February 20, 2014                    Decided August 14, 2014)

*Robert Maxwell* for appellant.

Todd D. Zirkle, pro se.

*Peter N. Mann* filed a brief for appellee Todd D. Zirkle.

*Jane Khoury* of the District of Columbia Volunteer Lawyers Project, with whom *Olivia Baker* was on the brief, pro se.

Before EASTERLY and MCLEESE, *Associate Judges,* and FERREN, *Senior Judge.*

MCLEESE, *Associate Judge*:   Following two bench trials, the trial court

granted Ms. Saxon and Mr. Zirkle an absolute divorce, denied Ms. Saxon's request for alimony, awarded the parties joint legal custody of their child, modified Mr. Zirkle's child-support obligations, and imposed sanctions against Ms. Saxon and her counsel, in the form of attorney's fees to be awarded to the District of Columbia Volunteer Lawyers Project ("DCVLP").[1]  In these appeals, Ms. Saxon challenges the trial court's imputation of $24,000 a year in income to Ms. Saxon, for purposes of determining alimony, child support, and sanctions.  Ms. Saxon further argues that that the trial court erred by awarding fees to DCVLP.  We affirm.

## I.

The following facts are undisputed.  Ms. Saxon and Mr. Zirkle married in the District of Columbia and had one child.  In November 2009, Ms. Saxon and Mr. Zirkle separated.  Mr. Zirkle filed a complaint in Superior Court seeking custody of the child.  The trial court subsequently ordered Mr. Zirkle to pay $1,368 per month in child support.  The trial court also appointed two volunteer attorneys

---

[1]  DCVLP is "a nonprofit organization whose mission is to provide high-quality, free legal services to low-income District of Columbia residents in family law cases."

associated with DCVLP to serve as pro bono guardians ad litem ("GALs") for the child in all matters concerning custody and visitation. The appointment order provided that the GALs "shall have all rights of a party to the case" and "shall serve without compensation."

In January 2011, Mr. Zirkle filed for divorce in the Superior Court. The trial court bifurcated the divorce trial from the custody trial. After the divorce trial, the trial court issued a judgment of absolute divorce, denying Ms. Saxon's request for alimony payments. In denying the request, the trial court imputed income to Ms. Saxon in the amount of $24,000, because Ms. Saxon had been "voluntarily unemployed" since the separation.

After the custody trial, the trial court issued an order reducing Mr. Zirkle's child-support obligation from $1,368 to $980 per month. Among other things, the reduction reflected Ms. Saxon's imputed income of $24,000. The trial court also awarded joint legal custody of the child to Ms. Saxon and Mr. Zirkle, with Ms. Saxon having primary physical custody of the child and Mr. Zirkle having a right of reasonable visitation and the right to make final decisions regarding the child's safety and general welfare.

During the course of the lengthy pretrial proceedings, DCVLP moved for sanctions against Ms. Saxon and her counsel under Superior Court Domestic Relations Rule 11 (authorizing imposition of sanctions, including requirement to pay attorney's fees of opposing party, where party or attorney files frivolous or abusive motions). The trial court granted the motion, on the ground that Ms. Saxon and her counsel had filed motions that were not well-grounded in fact and that were intended to cause delay and to needlessly increase the cost of the litigation. The trial court required Ms. Saxon and her attorney to pay DCVLP $10,740 to compensate the GALs for the work they did in responding to those motions and in litigating the issue of sanctions.

## II.

We address first Ms. Saxon's challenges to the trial court's decisions to impute $24,000 in income to Ms. Saxon in determining alimony, child support, and Rule 11 sanctions. "A trial court has a considerable measure of discretion in determining the appropriate amount of alimony and child support based on its determination of net income." *Araya v. Keleta*, 65 A.3d 40, 48 (D.C.) (internal quotation marks omitted), *cert. denied*, 134 S. Ct. 426 (2013). "That determination will not be disturbed on appeal unless the [trial] court clearly abused its

discretion." *Id.* (internal quotation marks omitted). Furthermore, we defer to the trial court's findings of fact unless they are "plainly wrong or without evidence to support [them]." D.C. Code § 17-305 (a) (2012 Repl.).

The issue of imputation first arose at an alimony hearing. During the course of that hearing, the following evidence was admitted on that issue: Ms. Saxon had a bachelor's degree from college; had two real-estate licenses; had been in the real-estate profession for over twenty-four years; and had earned as much as $189,000 per year as a real-estate agent. Ms. Saxon testified that her income had dropped recently, because she had stayed home to home-school the child, but that the child was now in school. Ms. Saxon testified that she was trying to return to real estate, but that the real-estate market was depressed, which limited her ability to earn income. She had one current listing, which was her own home, and had earned little income as a real-estate agent since the market declined. She had earned only $850 in the past year from "odd jobs," such as buying and selling antiques, and was living off of her $40,000 retirement. Ms. Saxon had explored the possibility of substitute teaching in Virginia. She had spoken with three principals in Virginia schools who told her that schools were "always looking for [substitutes]." Ms. Saxon also testified that she expected to be able to substitute teach. Without

objection, the trial court took judicial notice of the fact that the minimum salary for a substitute teacher in Fairfax County, Virginia was approximately $24,000.

Based on this evidence, the trial court found that Ms. Saxon could have earned more income than she was currently earning, whether as a substitute teacher or as a real-estate agent. Specifically, the trial court found that Ms. Saxon was qualified and appeared to be employable, that there was no evidence that Ms. Saxon was looking diligently for employment, that she could earn at least $24,000 as a substitute teacher, and that she was voluntarily limiting her income. The trial court therefore imputed $24,000 in income to Ms. Saxon.

The issue of imputation arose again with respect to child support. At a hearing in January 2012, the trial court considered additional evidence about Ms. Saxon's efforts in real estate and buying and selling antiques. The trial court noted that it had already imputed $24,000 for purposes of alimony, and at the hearing Ms. Saxon did not object to the propriety of imputing the same amount of income to her for purposes of determining child support. As a result, based on the prior record and the additional evidence, the trial court again imputed $24,000 in income to Ms. Saxon. The trial court noted that to impute income for purposes of child support it had to find that the party to whom income was being imputed was

"voluntarily unemployed or underemployed as a result of the parent's bad faith or deliberate effort to suppress income [or] to avoid or minimize the parent's child support obligation . . . ." D.C. Code § 16-916.01 (d)(10) (2012 Repl.). The trial court did not expressly make such a finding as to Ms. Saxon.

Finally, the imputation issue also arose when the trial court was determining Ms. Saxon's ability to pay the Rule 11 sanctions. The trial court relied on its previous discussions of imputed income in determining Ms. Saxon's earning potential, which informed the trial court's finding that Ms. Saxon had the ability to pay.

We conclude that there was sufficient evidence to support the conclusion that Ms. Saxon was voluntarily unemployed and that $24,000 in income should be imputed to her in all three contexts at issue. As to voluntary unemployment, there was evidence that Ms. Saxon had a bachelor's degree and prior work experience as a real-estate agent, had earned as much as $189,000 a year as a real-estate agent, and was not diligently looking for employment, even though she expected to be able to substitute teach. That evidence permitted the trial judge reasonably to conclude that Ms. Saxon had voluntarily limited her income for purposes of affecting the child-support determination. *Cf. Freeman v. Freeman*, 397 A.2d 554,

556 (D.C. 1979) (record supported trial court's finding that husband voluntarily reduced income by quitting well-paying job and making minimal effort to find employment commensurate with skills).[2]

With respect to the amount of income imputed, Ms. Saxon herself indicated that she was exploring substitute teaching, had been told by three different principals that schools in Virginia were "always looking for [substitutes]." Furthermore, although there was no evidence or finding as to whether Ms. Saxon had all of the credentials required to qualify as a substitute teacher in Fairfax County, her acknowledged expectation that she would be able to substitute teach there provided sufficient support for the trial court's reliance on that prospect. In addition, Ms. Saxon does not dispute that the minimum salary for a substitute teacher in Fairfax County, Virginia is approximately $24,000. This evidence adequately supported the trial court's determination to impute $24,000 in income to Ms. Saxon.

---

[2] The requirement that the voluntary unemployment be for the purpose of affecting the child-support obligation is imposed by D.C. Code § 16-916.01 (d)(10), which expressly addresses imputation of income in the context of child support. Although it is unclear to what extent, if any, the requirements of § 16-916.01 (d)(10) apply to imputation of income for purposes of determining alimony and sanctions, we need not reach that issue, because the record supports the conclusion that the requirements of § 16-916.01 (d)(10) were met in this case.

We are not persuaded by Ms. Saxon's arguments to the contrary. First, Ms. Saxon argues, for the first time on appeal, that the trial court erred in placing the burden on her of showing that her unemployment was not voluntary. Rather, she argues, Mr. Zirkle -- the party seeking to impute income -- had the burden of proving that Ms. Saxon was voluntarily unemployed.[3] Assuming without deciding that Ms. Saxon is correct, we conclude that any resulting error was harmless, because we are confident that the trial court's ruling did not turn on the statement about burden of proof. As to most of the relevant factors, the trial court made specific findings based on undisputed evidence or on matters that Ms. Saxon was not contesting. Moreover, in summarizing its conclusion, the trial court did not rely on the burden of proof, instead stating that the trial court "has determined that [Ms. Saxon] could have earned more income than what she did . . . , but that she was not being diligent about finding work . . . ." Finally, the trial court explicitly placed the burden on Mr. Zirkle to prove how much Ms. Saxon could earn. By imputing $24,000 in income to Ms. Saxon, the trial court necessarily found that Ms. Saxon could have earned that amount as a teacher. Accordingly, we conclude that any error in assigning the burden of proof did not adversely affect the

---

[3] Ms. Saxon relies on *Prisco v. Stroup*, 3 A.3d 316, 320 (D.C. 2010), in arguing that the party seeking to impute income bears the burden of proving voluntary unemployment. Because the court in *Prisco* was applying Virginia law, *id.* at 319-20, *Prisco* does not establish the law of the District of Columbia on the point.

judgment against Ms. Saxon. *Cf. In re D.R.J.*, 734 A.2d 162, 163-67 (D.C. 1999) (trial court's error in placing burden on defendant to rebut presumption of dangerousness was harmless, because there was "no doubt that the judge . . . would have reached the same conclusion" absent error, given trial court's ruling on closely related issue as to which trial court had placed burden on government).

Second, Ms. Saxon argues, for the first time on appeal, that the trial court made no express finding of bad faith as required under D.C. Code § 16-916.01 (d)(10). The record, however, supports such a finding, and the trial court expressly referred to the bad-faith requirement in the child-support order. "[T]rial judges are presumed to know and apply the proper legal standards." *Wright v. Hodges*, 681 A.2d 1102, 1105 (D.C. 1996); *see also In re C.T.*, 724 A.2d 590, 597 (D.C. 1999) ("Trial court rulings come to us with a presumption of correctness."). We therefore see no basis for reversal, particularly given the absence of objection by Ms. Saxon in the trial court. *Cf. Lewis v. United States*, 567 A.2d 1326, 1330-31 (D.C. 1989) (trial court's failure to make express finding by clear and convincing evidence that prior bad act had occurred was not plain error, where counsel did not request finding).

Third, Ms. Saxon argues that it was illogical for the trial court to determine that Ms. Saxon could obtain work as a substitute teacher, given that the trial court had found that Ms. Saxon was not successfully home-schooling the child and that Mr. Zirkle should make the final decisions concerning the child's education. The trial court could reasonably have concluded, however, that although Ms. Saxon was not well suited to dealing with the educational issues posed by her own child, who had special needs, Ms. Saxon's testimony nevertheless indicated that Ms. Saxon could obtain a position as a substitute teacher.

## III.

We next consider Ms. Saxon's challenge to the award of $11,740 in attorney's fees to DCVLP as a Rule 11 sanction. Ms. Saxon does not challenge the trial court's determination that sanctions were justified in light of the conduct of Ms. Saxon and her attorney. She does, however, raise several other objections to the award, almost all of which appear to have been raised for the first time in this court. We uphold the award.

**A.**

First, pointing out that one of the GALs was an inactive member of the District of Columbia Bar, Ms. Saxon argues that awarding attorney's fees to that GAL violated Rule 49 (c)(9)(B) of this court's rules, which prohibits an inactive member of the Bar from practicing law in the District of Columbia unless he or she "is employed by or affiliated with a non-profit organization . . . that provides legal services for indigent clients without fee . . . ." Although the trial court at times referred to an award of fees to the GALs, the trial court's written order explicitly directs that the fees are to be paid to DCVLP. Moreover, the GALs have explicitly disavowed any direct or indirect personal interest in the fee award. Thus, the premise of Ms. Saxon's argument is incorrect.[4]

---

[4] Although this court designated the individual GALs as appellees, it would be more accurate to view DCVLP, which is the actual recipient of the fees, as the appellee, and the GALs as attorneys representing DCVLP's interests in this court. We note that Ms. Saxon has not argued that any fee award was properly payable in the first instance only to the GALs or to the minor child, rather than to DCVLP. We therefore do not address that issue.

**B.**

Second, Ms. Saxon argues that the GALs were parties in the trial court, rather than attorneys representing a party, and that the sanctions award is therefore barred by the rule that pro se parties who are attorneys cannot be awarded fees as a sanction under Domestic Relations Rule 11. *See Upson v. Wallace*, 3 A.3d 1148, 1165-68 (D.C. 2010). We do not view either the attorney GALs or DCVLP as analogous to pro se attorneys.

The trial court had authority to appoint the attorney GALs in this case under D.C. Code §§ 16-914 (g) (2012 Repl.) (trial court in custody cases may appoint GAL, attorney, or both "to represent the minor child's interests"), -918 (b) (2012 Repl.) (in proceeding involving child custody, trial court may appoint disinterested attorney to appear on behalf of child and represent child's best interests). In its order of appointment, the trial court granted the GALs "all rights of a party," but also directed that the GALs "represent the best interests of the minor child" in the case. Similarly, in determining that an award under Rule 11 was warranted, the trial court indicated that the "GALs' sole duty is to act as 'advocates of the best interest of the child.'"

Pursuant to an administrative order issued by the Superior Court, GALs in custody cases must be attorneys. D.C. Fam. Ct. R. App. III, at I.B.1. The GAL's role is to represent the child's best interests. *Id.* at III.A. The administrative order requires the GAL to zealously represent the child's interests, to maintain the confidentiality of communications with the child, and to observe other of the requirements of the District of Columbia Rules of Professional Conduct applicable to attorneys who are representing clients. *Id.* at IV. Both under the administrative order and by statute, attorneys appointed to serve as GALs in custody cases may be compensated. *Id.* at II.A.5; D.C. Code § 16-918 (c). Under the administrative order, pro bono GALs are to serve without compensation. D.C. Fam. Ct. R. App. III, at II.A.6.

We do not view the role of attorney GALs, whether compensated or pro bono, as comparable to that of a pro se attorney. In holding that pro se attorneys cannot be awarded attorney's fees as a sanction under Domestic Relations Rule 11, the court in *Upson* emphasized several considerations that have no application to attorney GALs in custody cases. First, the court pointed out that pro se attorneys do not have a separate client and thus do not form an attorney-client relationship. *Upson*, 3 A.3d at 1166-67. In contrast, attorney GALs in custody cases are in many if not all respects in an attorney-client relationship with the children whom

they represent. *See* D.C. Fam. Ct. R. App. III, at III; *cf.* D.C. Bar, Ethics Op. 295, at 1 (2000) (In absence of conflict of interest, "[a] lawyer appointed to act as guardian ad litem in a child abuse and neglect proceeding . . . . is the child's lawyer.").

Second, the court in *Upson* pointed out that a pro se litigant who was not an attorney would not be entitled to obtain compensation under Rule 11 for the time spent litigating a matter. 3 A.3d at 1167 & n.36. The court suggested that it would be anomalous to permit such recovery by pro se litigants who happened to be attorneys. *Id.* In contrast, GALs in custody cases must be attorneys, and they may be compensated for their efforts. D.C. Fam. Ct. R. App. III, at I.B.1, II.A.5; D.C. Code § 16-918 (c). Permitting them to recover fees as a Rule 11 sanction thus would create no anomaly. To the contrary, permitting such recovery would simply treat them in a manner similar to comparably situated attorneys representing other clients.

Finally, the court in *Upson* noted its reluctance to encourage pro se litigation, even by attorneys. 3 A.3d at 1167-68. As the court explained, "the retention of independent and objective counsel can reduce the likelihood of frivolous claims in litigation." *Id.* at 1168.

> Even a skilled lawyer who represents himself is at a disadvantage in contested litigation. . . . He is deprived of the judgment of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, [and] formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom. The adage that a lawyer who represents himself has a fool for a client is the product of years of experience by seasoned litigators.

*Id*. at 1167 (internal quotation marks omitted). This rationale has no application to attorney GALs in custody cases. Their role is to represent the best interests of the child, not their own interests, and thus they do not present the risks posed when an attorney represents his or her own interests. There certainly is no policy to discourage attorney GALs from providing representation.

This court has not previously addressed whether attorney GALs in custody cases can be awarded attorney's fees as a sanction under Domestic Relations Rule 11. Other courts, however, have upheld sanctions awards made to GALs. *McKay v. Owens*, 937 P.2d 1222, 1232-33 (Idaho 1997) (affirming award of attorney's fees and research costs to GAL as sanction against plaintiff and her attorney for making deliberate misrepresentations to court); *GGV v. JLR*, 39 P.3d 1066, 1076 (Wyo. 2002) (GAL entitled to attorney's fees as sanction against mother, where

trial court found no reasonable cause for mother's appeal); *Peters v. Pennington*, 707 S.E.2d 724, 742-43 (N.C. Ct. App. 2011) (upholding award of attorney's fees to GAL as sanction against opposing counsel for making allegations that lacked factual support).

In sum, we hold that attorney GALs are not generally foreclosed from obtaining attorney's fees as a sanction under Domestic Rule 11.

## C.

Third, Ms. Saxon contends that the award of attorney's fees resulted in a windfall to DCVLP, because the GALs were appointed without compensation. In a wide variety of contexts, however, this court and others have held that attorney's fees may be awarded even though representation was provided on a pro bono basis. *See, e.g.*, *Loewinger v. Stokes*, 977 A.2d 901, 907, 924-25 (D.C. 2009) (upholding trial court order requiring contemnor to pay attorney's fees even though law firm provided free legal services); *In re Banks*, 805 A.2d 990, 1004-07 (D.C. 2002) (trial court permissibly required contemnor to pay attorney's fees to members of Committee on Unauthorized Practice of Law, where members included volunteer attorneys); *Link v. District of Columbia*, 650 A.2d 929, 933-34 (D.C. 1994)

(remanding for determination of attorney's fees to be awarded to party represented by legal-services agency; "whether representation was provided by private or nonprofit counsel . . . is irrelevant") (internal quotation marks omitted); *Habib v. Thurston*, 517 A.2d 1, 8 n.12 (D.C. 1985) (upholding award of attorney's fees to Neighborhood Legal Services, which provides free legal services for clients, as sanction pursuant to Super. Ct. Civ. R. 37 (a)(4) (permitting award of fees "incurred" in connection with discovery disputes)); *Entertainment Partners Grp., Inc. v. Davis*, 590 N.Y.S.2d 979, 986-88 (Sup. Ct. 1992) (citing cases), *aff'd*, 603 N.Y.S.2d 439 (App. Div. 1993).

Allowing attorney's fee awards in cases involving pro bono representation enhances the ability of pro bono organizations to represent individuals who are financially unable to obtain counsel and encourages private enforcement of the law. *See generally, e.g.*, *Link*, 650 A.2d at 934 ("When free legal services are provided there may be no direct barrier to the courtroom door, but if no fees are awarded, the burden of the costs is placed on the organization providing the services, and it correspondingly may decline to bring such suits and decide to concentrate its limited resources elsewhere . . . .") (internal quotation marks omitted); 1 Robert L. Rossi, *Attorneys' Fees* § 6:14, at 6-57 to -58 (3d ed. 2014) ("awarding fees even where the legal services are provided at no cost promotes the

policies that generally underlie fee statutes: encouragement of private enforcement of the law and the deterrence of improper conduct"). Moreover, awarding attorney's fees in the form of sanctions in cases involving pro bono representation can help to deter abusive litigation practices. *Cf. Copeland v. Marshall*, 205 U.S. App. D.C. 390, 409, 641 F.2d 880, 899 (1980) (en banc) (to compute fees differently depending on identity of successful plaintiff's attorney might give defendants an incentive to litigate imprudently; where plaintiff is represented by public-interest law firm, "[d]efendant's counsel could inundate the plaintiff with discovery requests without fear of paying the full value of the legal resources wasted in response"); *Do v. Superior Court*, 135 Cal. Rptr. 2d 855, 857 (Ct. App. 2003) ("It would ill serve the objectives of discovery statutes were we to conclude that, where a lawyer represents a party free of charge, the opponent may engage in discovery abuses with impunity.").

We recognize that language in *Upson*, 3 A.3d at 1165-68, suggests that a paying attorney-client relationship is necessary to support an award of attorney's fees under Domestic Relations Rule 11. Specifically, the court said, "Dom. Rel. R. 11, by its plain language, allows for the reimbursement of expenses and attorney's fees that have been *incurred* . . . . The rule presupposes a paying attorney-client relationship . . . ." *Id*. at 1167. We do not view this language in *Upson* as

controlling here. The issue squarely presented in *Upson* was whether attorney's fees can be awarded under Domestic Relations Rule 11 to a pro se attorney. As previously noted, the holding in *Upson* rested critically on several other considerations not applicable to fee awards to attorney GALs in custody cases, which is the issue presented in this case.

Moreover, reading *Upson* to broadly foreclose fee awards in cases involving pro bono representation under provisions that refer to fees having been "incurred" would be contrary to prior decisions of this and other courts. *See Habib*, 517 A.2d at 8 n.12 (upholding award of fees to pro bono legal-services organization as sanction under Super. Ct. Civ. R. 37 (a)(4), which permits award of "reasonable expenses incurred"); *cf. Centennial Archaeology, Inc. v. AECOM, Inc.*, 688 F.3d 673, 678-82 (10th Cir. 2012) (inclusion of word "incurred" in rule permitting fee award did not preclude award in case where plaintiff's lawyers were working under a fixed fee; "the term *attorney fees* . . . mean[s], not the amount actually paid or owed by the party to its attorney, but the value of attorney services provided to the party") (citing cases); *Do*, 135 Cal. Rptr. 2d at 860-61 ("fees or monetary sanctions in the form of fees may be ordered . . . . whether or not a party actually 'incurs' additional fees as a result of the opposing party's conduct as is the case here where the party is represented by a lawyer who does not charge a fee"). *But*

*cf., e.g.*, *In re Espy*, 358 U.S. App. D.C. 49, 51-52, 338 F.3d 1036, 1038-39 (2003) (per curiam) (refusing to award petitioner attorney's fees under Independent Counsel statute, where petitioner was not liable for fees and therefore did not "incur[]" fees as required by statute).

In sum, we uphold the award of attorney's fees to DCVLP.

**D.**

Ms. Saxon also raises three challenges to the amount of the award. We conclude that the amount of the award was reasonable.

First, Ms. Saxon contends that the trial court failed to apply the factors governing the imposition of monetary sanctions based on the filing of frivolous pleadings, as specified in *Cunningham v. Bathon*, 719 A.2d 497, 502 (D.C. 1998).[5]

---

[5] The factors are:

> (1) the reasonableness of the injured party's attorneys' fees . . . , (2) the minimum amount that will serve to adequately deter the undesirable behavior, (3) the offending party's ability to pay . . . , and (4) the offending party's history, experience, and ability, the severity of the violation, the degree to which malice or

(continued…)

*Cunningham*, however, involved the imposition of sanctions under Rule 11 of the Superior Court Civil Rules. *Id.* The sanctions in the present case were imposed under Domestic Relations Rule 11, which is worded differently from Civil Rule 11. Most significantly, Civil Rule 11 requires that any sanction be "limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated," Super. Ct. Civ. R. 11 (c)(2), but Domestic Relations Rule 11 does not include such a limitation. In any event, the factors considered by the trial court in this case are otherwise in substance consistent with the *Cunningham* factors, although appropriately viewed through the lens of the particular circumstances of domestic-relations cases. *See, e.g.*, *Assidon v. Abboushi*, 16 A.3d 939, 943-44 (D.C. 2011) (child-custody proceeding).

Second, Ms. Saxon contends that the trial court erred in finding that she had the ability to pay the sanctions award. We review a trial court's determination of the amount of sanctions imposed under Rule 11 for abuse of discretion. *Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Chartered*, 935

---

(…continued)

> bad faith contributed to the violation, the risk of chilling the type of litigation involved, and other factors as deemed appropriate in individual circumstances.

*Cunningham*, 719 A.2d at 502 (internal quotation marks omitted).

A.2d 362, 377 (D.C. 2007); *cf. Federal Mktg. Co. v. Virginia Impression Prods. Co.*, 823 A.2d 513, 530 (D.C. 2003) (court reviews for abuse of discretion trial court's determination of amount of attorney's fee award). We find no abuse of discretion. The trial court reasonably viewed Ms. Saxon's earning capacity as substantial, and gave her nine months to pay the award of approximately $10,000, for which her attorney was also liable.

Finally, Ms. Saxon alleges that the amount of the award was unreasonable, because "more than half the time spent and awarded was for research and litigation of [Domestic Relations Rule 11] sanctions."[6] We disagree. Ms. Saxon herself increased the amount of time and cost of litigating the sanctions issue. In a twenty-seven page ruling, the trial court determined that Ms. Saxon and her attorney had committed numerous Rule 11 violations by raising issues that had already been resolved, misstating material facts, and misrepresenting the record. Furthermore, Ms. Saxon extended the dispute by filing numerous unsuccessful motions and pleadings in opposition to the GALs' motions for sanctions, including, for example, a motion to strike the GALs' opposition to Ms. Saxon's previous motion

---

[6] We do not understand Ms. Saxon to contend that sanctions awarded under Domestic Relations Rule 11 can never include fees for time spent litigating the question of sanctions. Rather, her challenge seems to be that an unreasonably high percentage of the award in this case related to time the GALs spent litigating the sanctions issue.

to strike a filing by the GALs.  Under the circumstances, we hold that the amount of the award was reasonable.

The judgment of the Superior Court is therefore

*Affirmed.*