IN THE SUPREME COURT OF THE STATE OF IDAHO

Docket No. 38830

BUCKSKIN PROPERTIES, INC., an Idaho corporation; TIMBERLINE DEVELOPMENT, LLC, an Idaho limited liability company,

    Plaintiffs-Appellants-Cross Respondents,

v.

VALLEY COUNTY, a political subdivision of the State of Idaho,

    Defendant-Respondent-Cross Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, January 2013 Term

2013 Opinion No. 38

Filed: March 29, 2013

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Valley County.  Hon. Michael R. McLaughlin, District Judge.

The judgment of the district court is affirmed.

Evans Keane, LLP, Boise, for appellants. Victor S. Villegas argued.

Givens Pursley, LLP, Boise, for respondent. Christopher H. Meyer argued.

_____

J. JONES, Justice.

Subdivision developers, Buckskin Properties, Inc. and Timberline Development, LLC (collectively "Buckskin"), brought suit against Valley County seeking recovery of monies paid to the County for road development and declaratory relief from payment of any further monies. The district court granted summary judgment to the County and Buckskin timely appealed. We affirm.

I.
FACTUAL AND PROCEDURAL HISTORY

On or about April 1, 2004, Buckskin submitted a land use application to Valley County, seeking to develop The Meadows, a multi-phase development project consisting of six phases. The application was for approval of a Planned Unit Development (PUD), a Conditional Use Permit (CUP) and preliminary and final plats for Phase 1 of the development. Buckskin included as part of its application a proposed "capital contribution agreement" in which it agreed to provide mitigation

1

for the traffic impact of its development. Among other things, Buckskin proposed to pay a road impact fee of $1,870 "per equivalent single-family residential unit." Buckskin's project engineer stated that the proposed agreement was included in the application because it was required by the County. Buckskin subsequently submitted a revised application providing that the PUD would consist of 221 single-family units, 160 multi-family units, and approximately 55,000 square feet of commercial amenities to be constructed in six discrete phases.

The CUP for The Meadows was approved by the County's planning and zoning commission on July 14, 2004. The approved use under the CUP was for "221 single-family residential lots, 17 common lots, 2 commercial lots totaling 11.2 acres, and 160 multi-family units." The CUP contained seventeen conditions of approval, including that the "Capital Contribution Agreement must receive approval from the Board of County Commissioners." On July 14, Buckskin signed a revised Capital Contribution Agreement (CCA), which had been prepared by the County, and the County Board approved and signed the CCA on July 26.

The CCA pertained specifically to Phase 1 of The Meadows, reciting that "[Buckskin] has agreed to participate in the cost of mitigating [impacts on public services and infrastructure reasonably attributable to The Meadows] by contributing its proportionate fair share of the cost of the needed improvements identified in [the CCA]." The CCA provided that Buckskin shall "contribute capital to road impact mitigation as established by Valley County at the time the final plat of each phase of [The Meadows] is recorded." The CCA required Buckskin to pay road improvement costs for future phases of the development and required the County to segregate Buckskin's contributions and apply them only to road improvement projects agreed upon by the parties. The mitigation cost for Phase 1 totaled $79,292. Buckskin conveyed a right-of-way to the County on October 25, 2004, in order to satisfy the Phase 1 mitigation costs. The right-of-way was valued at $91,142, which exceeded the amount due for Phase 1 by $11,850, for which Buckskin was given credit.

On September 26, 2005, Buckskin and the County executed a Road Development Agreement (RDA)[1] that governed the mitigation costs for Phases 2 and 3 of The Meadows.[2] Buckskin agreed to mitigate the impacts of the development by "contributing its proportionate fair

---

[1] Road development agreement and capital contribution agreement are synonymous terms. Both terms are used in this opinion because Phase 1 of Buckskin's PUD was governed by a "capital contribution agreement" and Phases 2 and 3 were governed by a "road development agreement."

[2] The RDA executed on September 26, 2005, by its terms only governs Phase 2 of The Meadows. However, both parties' briefing indicates that the RDA governed both Phases 2 and 3.

share of the cost of the needed improvements identified in the [RDA]." Again, the County was required to segregate the funds and apply them only to the project costs of road improvement projects agreed upon by the parties. Under the Phase 2 and 3 RDA, the mitigation cost totaled $247,096. After applying several credits, Buckskin's balance was $232,160, which it paid.

In the summer of 2007 Buckskin began to move toward final plat approval for Phases 4–6. During preliminary discussions, Buckskin learned that the per-lot mitigation fee for Phases 4–6 would be $3,968, more than twice the $1,844 per-lot fee for Phases 1−3. No portion of the mitigation costs for Phases 4–6 of The Meadows was ever paid by Buckskin.

Buckskin filed its Complaint on December 1, 2009, seeking a declaratory ruling that the County's practice of requiring developers to enter into RDAs constituted an illegal impact fee and also seeking recovery of the money it had paid for Phases 2 and 3 on an inverse condemnation theory. The County moved for summary judgment on a number of grounds, including that Buckskin's lawsuit was barred by the four-year limitations period in I.C. § 5-224. On January 7, 2011, the district court issued its initial decision, holding that the four-year statute of limitations began to run, at the very latest, on October 25, 2004, when Buckskin conveyed the right-of-way to the County to satisfy the Phase 1 mitigation costs, and that Buckskin had waited too long to sue.

Buckskin requested reconsideration and also moved for summary judgment on its claim for declaratory relief, arguing among other things, that each phase of the project should be considered individually and that the court's ruling on the statute of limitations did not apply to the uncompleted Phases 4−6. In response, the County argued that the statute of limitations commenced to run at the same time for all phases of the development because it was governed by a single CUP and, alternately, that Buckskin's request for declaratory relief with regard to Phases 4−6 was mooted by the County's adoption of Resolution 11-6 on March 7, 2011.[3] On April 11, 2011, the district court entered a further decision upholding its ruling on the statute of limitations with regard to all phases of the project and finding that Buckskin's claims with regard to Phases 4−6 had been mooted by Resolution 11-6. The court denied the County's request for attorney fees. Buckskin appealed the district court's dismissal of its claims and the County cross-appealed the denial of its

---

[3] The County resolved in Resolution 11-6, that "the Board of County Commissioners will no longer enter into Road Development Agreements calling for the payment of fees or other contributions for off-site road improvements until such time as the County adopts an IDIFA-compliant ordinance, unless the permit holder voluntarily and expressly waives any objection thereto." The Idaho Development Impact Fee Act, I.C. § 67-8201−8216, provides requirements that governmental entities must follow in order to impose impact fees. I.C. § 67-8204.

fee request.

## II.
## ISSUES ON REVIEW

1. May a governing board lawfully make an agreement with a land developer for the funding and construction of new infrastructure?
2. Did Buckskin fail to exhaust its administrative remedies?
3. Did the district court err in dismissing Buckskin's inverse condemnation claim?
4. Did Resolution 11-6 moot Buckskin's claim for declaratory relief as to Phases 4-6?
5. Did the district court err in denying the County's request for attorney fees?
6. Is either party entitled to attorney fees on appeal?

## III.
## DISCUSSION

### A.       Standard of Review.

In "reviewing a grant of summary judgment, this Court employs the same standard as used by the district court originally ruling on the motion." *Cnty. of Boise v. ICRMP, Underwriters*, 151 Idaho 901, 904, 265 P.3d 514, 517 (2011). Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). Additionally, this Court exercises free review over questions of law. *Cnty. of Boise*, 151 Idaho at 904, 265 P.3d at 517. This Court reviews the district court's denial of attorney fees predicated on I.C. § 12-117 for an abuse of discretion. *City of Osburn v. Randel*, 152 Idaho 906, 908, 277 P.3d 353, 355 (2012).

### B.       A governing board may lawfully make a voluntary agreement with a land developer for the funding and construction of new infrastructure.

Interwoven among the issues presented on appeal is whether a governing board may lawfully make an agreement with a developer to fund the construction of new infrastructure as part of the development approval process. Buckskin contends that it was required against its will to pay for road improvements in the vicinity of its proposed development as a condition of gaining the County's approval of its plans. It contends this was a condition unlawfully imposed upon it and that the payment requirement constituted an unlawful development impact fee. Buckskin bases its inverse condemnation claim to recover the Phases 2−3 payment, as well as the claim for declaratory relief with respect to any fee for Phases 4−6, upon grounds of illegality. On the other hand, the County asserts that a governing body and developer may lawfully enter into

such an agreement so long as it is voluntary on the part of both parties, citing *KMST, LLC v. Cnty. of Ada*, 138 Idaho 577, 67 P.3d 56 (2003) and I.C. § 67-6512(d)(6).[4]

Because this issue is central to the determination of this case, we address it first. Both the CCA and the RDA characterized the payment required by Buckskin as a "capital contribution." The characterization of the charge is not, however, as important as the true nature of the charge. As Buckskin notes in its brief, the charge originated from a Capital Improvement Program (CIP) instituted by the County to identify "different areas throughout the county to determine the level of road improvements necessary for the roads in that area to handle the increases in traffic as a result of the development." Buckskin observes that the County's Master Transportation Plan describes the CIP as a plan "to require new developments to pay a fee to mitigate the impacts of their developments on the roads and bridges" in the County. According to the CIP, "[d]evelopers are, in effect, required to pay for the roadway capacity their developments use." Buckskin states that "the CIP is not part of the [County's Land Use Development Ordinance (LUDO)] and is not an ordinance or law."[5]

Both the CCA and the RDA recite that Buckskin has agreed to participate in the cost of mitigating the road impacts caused by its development by contributing its proportionate fair share to the cost of the needed road improvements specifically identified in the agreement. Both agreements call for the County to segregate the contributions made by Buckskin so that the funds are "earmarked and applied only to the project costs of the road improvement projects which are specified [in an attached exhibit] or to such other projects as are mutually agreed to by the parties." There is no indication in the record that the sums collected from Buckskin were used for any purpose not authorized in the CCA or RDA. Indeed, the affidavit of the County's Planning and Zoning Administrator states, without contradiction, that all monies received from Buckskin were spent in accordance with the County's obligations in the agreements, that "the County would not have undertaken the road improvements and expenditures" but for the agreements, and

---

[4] Section 67-6512(d)(6) provides that "[u]pon the granting of a special use permit," a governing body may attach conditions, including those "[r]equiring the provision for on-site and off-site public facilities or services." The County contends it was responsible for ensuring that adequate road infrastructure would be in place to support the new development, that it did not at the time have the funds to build the infrastructure, and that Buckskin "elected to make contributions to the County reflecting [its] project's proportionate share of the costs of the improvements."

[5] In this regard, it should be noted that the "contribution" called for in the CCA and RDA are not required under any County ordinance or resolution. Further, Buckskin does not seek in this action to have any ordinance of the County declared unlawful. Buckskin seeks only to challenge the requirement that it enter into a capital contribution agreement or road development agreement that entails an impact contribution.

5

that the "capital investments have improved transportation access to The Meadows and have thereby benefitted [Buckskin] and the current residents of The Meadows."

Buckskin provides no authority for the proposition that a developer and governing board are prohibited from voluntarily entering into an agreement to fund and construct capital improvements that will facilitate the developer's development plans. Indeed, such agreements can benefit both the County taxpayers and developers. There is no reason why a governing body should be required to resort to taxpayer-derived revenue as the sole source of moving forward with capital improvements, such as road construction, that will primarily benefit a developer. On the other hand, it makes little sense to prohibit developers from voluntarily agreeing to shoulder a portion of the development costs in order to more quickly move forward with development of their property.

The Idaho Development Impact Fee Act (IDIFA) establishes "uniform standards by which local governments may require that those who benefit from new growth and development pay a proportionate share of the cost of new public facilities" and sets "minimum standards for the adoption of development impact fee ordinances by governmental entities." I.C. § 67-8202. However, IDIFA does not prohibit governmental entities and developers from voluntarily entering into contracts to fund and construct improvements. Indeed, IDIFA exempts certain transactions—"[a]mounts collected from a developer in a transaction in which the governmental entity has incurred expenses in constructing capital improvements for the development if the owner or developer has agreed to be financially responsible for the construction or installation of the capital improvements." I.C. § 67-8203(9)(d).[6] Presumably, a voluntary agreement between a governmental entity and a developer, whereby the developer voluntarily agrees to pay for capital improvements that will facilitate his development plans, does not run afoul of IDIFA.[7] The key is whether the payment agreement is truly voluntary.

The definition of development impact fee, or impact fee, in IDIFA highlights the fact that it was not designed to restrict the ability of governmental entities and land developers to

---

[6] We do not, and need not, determine for purposes of this opinion whether the CCA or RDA meet the requirements of this provision.

[7] IDIFA specifically exempts from its coverage "private agreements between . . . developers . . . and governmental entities in regard to the construction or installation of system improvements," which include "any local, collector, arterial or other street." I.C. § 67-8214(2); I.C. § 67-8203(28); I.C. § 50-1703(a)(1). Further, IDIFA states that it is not intended to obligate a governmental entity "to approve development which results in an extraordinary impact." I.C. § 67-8214(3).

voluntarily negotiate and enter into mutually beneficial contracts. A development impact fee is defined as "a payment of money *imposed* as a condition of development approval to pay for a proportionate share of the cost of system improvements needed to serve development." I.C. § 67-8203(9) (emphasis added). The word "impose" means "to place or set (a burden, tax, fine, etc. *on* or *upon*) as by authority." WEBSTER'S NEW WORLD DICTIONARY 678 (3rd College ed. 1988). A charge is not necessarily "imposed" when it is voluntarily agreed to and paid in exchange for good and valuable consideration.

Furthermore, even without the agreement of the developer, a governing board may attach a condition to a CUP requiring the provision for off-site public facilities or requiring mitigation of effects of the proposed development upon service delivery by any political subdivision. I.C. § 67-6512(d)(6) and (8). If a governing board attaches a condition unacceptable to the developer, the developer may seek judicial review (I.C. § 67-6519(4)) or request a regulatory taking analysis pursuant to I.C. § 67-8003. I.C. § 67-6512(a).

In this case, Buckskin accompanied its application for development of The Meadows with a proposed capital contribution agreement. The proposal states that the intent of the agreement is "to memorialize agreed-upon compensation and reimbursements to Valley County." The proposal states that Buckskin "agrees to pay a road impact fee as established by Valley County," in the amount of $1,870 per equivalent single-family residential unit. The County subsequently drafted its own CCA, which the parties signed and which established a fee or contribution somewhat less than that proposed by Buckskin. The County affirms that Buckskin "did not appeal, contest, or seek judicial review of the CUP (at either the recommendation or final action stage)" and that prior to filing suit Buckskin "took no other action to protest or otherwise object to the CUP, the [CCA or RDA], or payments made pursuant to any of them." Buckskin does not contend otherwise. However, according to Buckskin's project engineer:

> I did not prepare the proposed Development Agreement and proposed Capital Contribution Agreement because Buckskin volunteered to pay impact fees to Valley County. Rather, these items were required by Valley County and I wanted to ensure that Buckskin's application was not incomplete, which would have resulted in additional delays in obtaining approvals.

The proposed Development Agreement referred to by the project engineer does not appear to have been entered into between the parties but, as indicated above, the revised CCA was agreed

7

to and signed by the parties. There is no indication in the record, however, that Buckskin communicated any objection to anyone about the terms of the CCA or RDA. The project engineer stated that he did not discuss any of the terms of the CCA with any County official. As noted by the County, "[p]erhaps the developers of The Meadows were not pleased with the idea of paying for road improvements benefiting their property, but they did not say so and they certainly did not challenge the County's authority to require such mitigation." Buckskin's engineer simply believed that the County had legal authority to require the CCA, but he makes no contention that he was relying on any representation to that effect by any County official.

There is no evidence in the record indicating that Buckskin was strong-armed into signing the CCA or RDA; that it voiced any objection to anyone, at any time, to making the payment required under either agreement; or that it did not, as the County avers, benefit from the agreement by virtue of the road improvements facilitated by its payments. All that Buckskin offers is the project engineer's statement that it probably would not have volunteered to make the payments. Apparently, Buckskin did not realize that it should not have agreed to make the payments until after the County had made the road improvements described in the agreements and the Valley County real estate bubble had burst.

Having determined that a developer and a governing board can legally enter into a voluntary agreement to fund capital improvements to be made by the governmental entity that facilitate the developer's development plans, and that the record discloses no evidence to indicate Buckskin's entry into the CCA and RDA was other than voluntary, we turn to a determination of the issues presented on appeal.

### C. Buckskin failed to exhaust its administrative remedies.

On appeal, the County argues that the Court does not have jurisdiction to hear this case because Buckskin failed to exhaust its available administrative remedies. Specifically, the County argues that the Local Land Use Planning Act (LLUPA), I.C. § 67-6501 to 6536, required Buckskin to file a petition for judicial review within 28 days of the County's final permitting decision, which it did not do. The County argues that judicial review is the exclusive procedure for challenging a decision to grant or deny a permit where review is provided under LLUPA and argues that I.C. §§ 67-6519(4) and 67-6521(1)(d) provided for review. Buckskin asserts the County's position is without merit because Buckskin's challenge to the CCA and RDA does not involve the grant or

denial of a permit, and judicial review under the Idaho Administrative Procedure Act (IDAPA) would not have granted Buckskin the relief it sought.

LLUPA "permits judicial review of some land use decisions made by a governing board." *Highlands Dev. Corp. v. City of Boise*, 145 Idaho 958, 961, 188 P.3d 900, 903 (2008). A local agency making land use decisions under LLUPA is treated as a government agency under IDAPA. *Crown Point Dev., Inc. v. City of Sun Valley*, 144 Idaho 72, 75, 156 P.3d 573, 576 (2007). "The doctrine of exhaustion requires that where an administrative remedy is provided by statute, relief must first be sought by exhausting such remedies before the courts will act." *Regan v. Kootenai Cnty.*, 140 Idaho 721, 724, 100 P.3d 615, 618 (2004). Where a party aggrieved by a land use decision fails to exhaust administrative remedies, dismissal of its claim is warranted. *Id.*

Former I.C. § 67-6519(4),[8] entitled Permit Granting Process, stated that, "[a]n applicant denied a permit or aggrieved by a decision may within [28] days after all remedies have been exhausted under local ordinance seek judicial review under the procedures provided by [IDAPA]" S.L. 2003, ch. 123, § 2. This Court has held that former I.C. § 67-6519 "grants the right of judicial review to persons who have applied for a permit required or authorized under LLUPA and were denied the permit or aggrieved by the decision on the application for the permit." *Highlands Dev.*, 145 Idaho at 961, 188 P.3d at 903. Additionally, the terms of former I.C. § 67-6521 allowed an affected person—one having an interest in real property which may be adversely affected by the issuance or denial of a permit—to seek review under IDAPA within 28 days after exhausting all remedies under local ordinances. S.L. 1996, ch. 199, § 1.

As the County points out, Buckskin failed to seek judicial review of the requirement in its CUP that the CCA received the County Board's approval. If Buckskin truly was aggrieved by this requirement, it had the ability to seek judicial review. By failing to do so, it cannot now complain. Buckskin states that the CCA and RDA are not "permits" and therefore were not reviewable under LLUPA. Indeed, the agreements are not permits but voluntary agreements entered into by the parties. However, the requirement that the CCA receive Board approval is a condition attached to the CUP and is a matter that could have been challenged on judicial review.

---

[8] In 2010 the Legislature made multiple amendments to LLUPA including I.C. §§ 67-6519 and 67-6521. S.L. 2010, ch. 175, §§ 1 and 3. This court has previously held that the statute in effect at the time judicial review was sought, or should have been sought, governs on appeal. *Stafford v. Kootenai Cnty.*, 150 Idaho 841, 847, 252 P.3d 1259, 1265 (2011). Thus, the pre-2010 amendment language is used to evaluate the parties' arguments in this case.

It is obvious that Buckskin made no such challenge and therefore did not exhaust its administrative remedies.

Buckskin's claim that judicial review would not have provided the relief it sought is also without merit. Had Buckskin truly objected to the CUP condition, and had it successfully challenged the condition and the validity of the CCA on judicial review, it might have been able to avoid paying the road impact charges for all six phases of The Meadows.

However, although Buckskin forwent its ability to challenge the requirement that the CCA (and subsequent RDA) be approved by the County Board, that is not necessarily the end of the story. Buckskin could certainly raise breach of contract claims arising under the two agreements and may also have had the ability to assert an inverse condemnation claim.

### D. There was no compensable taking of Buckskin's property.

Buckskin sought to recover the charges it paid for Phases 2 and 3 on a theory of inverse condemnation. The district court dismissed the inverse condemnation claim based on the four-year statute of limitations in I.C. § 5-224. Relying on *Tibbs v. City of Sandpoint*, 100 Idaho 667, 671, 603 P.2d 1001, 1005 (1979), the court found that the limitations period on Buckskin's claim accrued, at the latest, on October 25, 2004, the date Buckskin dedicated a right-of-way to the County as payment for Phase 1. The district court later elaborated on this finding stating:

> Here the entire project was governed by a single [CUP] and at the very latest, October 25, 2004 was the date when the statute of limitations began to run on all of [Buckskin's] claims regarding each phase of the entire project because that was the date when the dedication of right of way was accepted and it was at that point in time at which an impairment of such a degree and kind as to constitute a substantial interference with [Buckskin's] property interest became apparent.

On appeal, Buckskin argues that each fee paid for the separate phases should have separate accrual dates and it was an error to link all fee payments to a single accrual date. Buckskin sets out two primary arguments to support separate accrual dates. First, Buckskin argues that the court improperly expanded the test for determining when an inverse condemnation claim accrues. Second, Buckskin argues that ripeness considerations require that each fee payment be treated separately and given separate accrual dates. In response, the County argues that the district court properly dismissed Buckskin's case because its claims were not timely under the four-year limitations period in I.C. § 5-224. More fundamentally, the County contends that Buckskin has no compensable inverse condemnation claim because there was simply no taking. That is, Buckskin voluntarily agreed to the terms of the CCA and RDA, received the benefits of the agreements, and

10

cannot now claim that the County took from it any property.

At the outset, it is not entirely clear that Buckskin can pursue an inverse condemnation claim by virtue of having failed to exhaust its administrative remedies. Idaho Code § 67-6521 exempts an "affected person" from the exhaustion requirement where the person is pursuing an inverse condemnation claim for a perceived "taking," as defined in the statute. I.C. § 67-6521(2)(b). Buckskin has nowhere cited this provision in its briefing, nor has it sought to bring its claim within the coverage of the provision, but as we are dealing with an issue presented on summary judgment, we will assume, without deciding, that the provision applies. We do not consider or decide whether a person could pursue an inverse condemnation claim, other than as defined in I.C. § 67-6521(2)(b), for a land use decision where there was a failure to exhaust administrative remedies.

This Court need not address the district court's application of the statute of limitations because the more fundamental ground asserted by the County—that there was no taking—provides a substantial alternate ground for upholding the district court. This case has much in common with this Court's decision in *KMST*. There, the Court was considering a developer's inverse condemnation claim, where the developer sought to recover the cost of constructing a street along the side of its development, even though the developer had initially proposed that it be responsible for such construction. 138 Idaho at 579, 67 P.3d at 58. An employee of the Ada County Highway District (ACHD) had advised a KMST partner that he would recommend the developer construct the street and dedicate it to the public. KMST's application to ACHD stated that it would do so. *Id.* The ACHD commissioners approved the application with the street requirement and it went to Ada County officials for consideration. KMST's representative asked that the developer not be required to construct the street but the application was approved by Ada County without deleting the requirement. *Id.*

> The Court recited:
>
> A property owner who believes that his or her property, or some interest therein, has been invaded or appropriated to the extent of a taking, but without due process of law and the payment of just compensation, may bring an action for inverse condemnation. . . . The property owner cannot maintain an inverse condemnation action unless there has actually been a taking of his or her property.

*Id.* at 581, 67 P.3d at 60 (citations omitted). The Court held that the requirement to construct and dedicate the street did not constitute a taking of KMST's property because ACHD did not have

11

final authority to impose that condition. *Id.* According to the Court, Ada County was the governmental entity with the authority to make the final decision on the condition and KMST had not appealed the judgment dismissing its claim against Ada County. *Id.* at 582, 67 P.3d at 61.

> The Court continued:

> Even assuming that the ACHD had final authority to approve some aspect of KMST's proposed development, there was no taking under the facts of this case. In the initial land use application that is submitted to the ACHD, KMST stated that it would build the public road.
> . . . .

> Although [ACHD's representative] had informed KMST that he would recommend that requirement as a condition of approval, he did not have the authority to impose that condition. . . . The district court found "that as a general matter developers do not include conditions in development applications if they disagree with the conditions." The district court also found, "KMST representatives included the construction and dedication of Bird Street in the application because they were concerned that failing to do so would delay closing on the property and development of the property." KMST's property was not taken. It voluntarily decided to dedicate the road to the public in order to speed the approval of the development. Having done so, it cannot now claim that its property was "taken."

*Id.* The Court noted, "We are holding that there was no taking because KMST itself proposed that it would construct and dedicate the street as part of its development." *Id.*, n.1.

In this case, there was no taking because Buckskin initially proposed in its application that the parties enter into a capital contribution agreement that called for it to pay "agreed-upon compensation" to the County. The amount of the proposed payment was actually slightly more than the County included in the CCA which was signed by the parties. Buckskin stated no objection to the CCA or the requirement of paying the compensation. At that time, it was seeking approval of a subdivision plat, a PUD, and a CUP. Based on amendments made in 2003 to the three pertinent code sections of LLUPA—I.C. § 67-6512, which deals with special or conditional use permits; I.C. § 67-6513, which deals with subdivision permits; and I.C. § 67-6515, which deals with planned unit development permits—Buckskin could have requested a regulatory taking analysis pursuant to I.C. § 67-8003. S.L. 2003, ch. 142, §§ 2−4. Buckskin did not do so. It could have sought judicial review pursuant to I.C. §§ 67-6519 or 67-6521. It did not do so. It could have objected and paid under protest. It did not do so. There is no indication that Buckskin complained about, or objected to, the CCA, the RDA, or the impact charges to any representative

12

of the County at any time. Buckskin does not claim that the improvements identified in the CCA and RDA were not completed or that the County failed to perform the terms of either agreement in any fashion. Nothing was taken from Buckskin and, therefore, it has no grounds for asserting an inverse condemnation claim.

### E. Resolution 11-6 rendered Buckskin's claim for declaratory relief moot.

In its second summary judgment ruling, the district court held that Resolution 11-6 rendered Buckskin's claim for declaratory relief moot because it gave Buckskin the opportunity to negotiate new RDAs for Phases 4−6, subject to the terms of the Resolution. On appeal, Buckskin argues that Resolution 11-6 did not render its claim for declaratory relief moot, and the district court erred in so holding. First, Buckskin argues that Resolution 11-6 did not moot its claim because a resolution is merely an expression of opinion, not law. Second, Buckskin argues that because none of the controlling legal mechanisms in the County's LUDO, requiring payment of impact fees, have been abolished, the Resolution cannot moot its claim for declaratory relief. Third, Buckskin argues that Resolution 11-6 does not moot its declaratory relief claim because the County has no authority under Idaho law to require a developer to negotiate or enter into a development agreement. Buckskin's ultimate concern is that even with Resolution 11-6 in place, the County still has the power to deny final plat approval for Phases 4−6 if Buckskin refuses to agree to pay impact fees.

The County argues that the district court properly ruled that Resolution 11-6 mooted Buckskin's claim for declaratory relief. Buckskin acknowledges that the Resolution is not law, but asserts that it constitutes an unequivocal and binding waiver as to Buckskin, and that if the County were to act inconsistently with the Resolution's assurances, Buckskin could challenge the action under LLUPA.

"An issue becomes moot if it does not present a real and substantial controversy that is capable of being concluded through judicial decree of specific relief." *Koch v. Canyon Cnty.*, 145 Idaho 158, 163, 177 P.3d 372, 377 (2008) (quoting *Ameritel Inns, Inc. v. Greater Boise Auditorium Dist.*, 141 Idaho 849, 851, 119 P.3d 624, 626 (2005)).

Buckskin and the County entered into the CCA on July 14, 2004. The CCA provides that Buckskin will contribute capital to road impact mitigation upon the recording of the final plat of any future phase of the development. The CCA was in effect when this suit was initiated and when Resolution 11-6 was passed by the County. Because the agreement is currently in effect,

13

Section 4 of Resolution 11-6 governs how the CCA will be treated. Under Section 4, for any agreement in effect that calls for the payment of fees that have not yet been made, the permit holder may elect:

> (1) To make those payments or contributions in accordance with the [RDA], (2) to request the County to temporarily suspend the permit holder's obligation under the [RDA] and/or other deadlines for a period of time during which no further development is anticipated, or (3) to notify the County that the permit holder wishes to negotiate a new [RDA].

In the event that a party wishes to negotiate a new RDA, Resolution 11-6 sets out two possibilities. First, if an IDIFA-compliant ordinance has been enacted, the revised RDA will be in accordance with the ordinance. Second, if no IDIFA-compliant ordinance has been enacted, then "the County will seek other ways to meet its obligation to ensure the availability of adequate public services for the new development."

In this case, Resolution 11-6 has mooted Buckskin's claim for declaratory relief because Buckskin cannot be required to enter into non-IDIFA-compliant RDAs for Phases 4–6. Instead, Section 4 allows Buckskin to temporarily suspend its obligations under the RDA, negotiate a new IDIFA-compliant RDA, or, absent an IDIFA-compliant ordinance, require the County to meet its obligation to provide adequate public services by other means.

Because Resolution 11-6 allows developers to negotiate for new RDAs subject to the terms of Section 4, Buckskin is not required to "pay money for its proportionate share of road improvement costs," as Buckskin alleged was occurring in its declaratory relief claim. Thus, the County is no longer engaged in the conduct that formed the basis for Buckskin's claim for declaratory relief and no real or substantial controversy exists,[9] rendering the claim moot.

Furthermore, the doctrine of judicial estoppel, adopted by this Court in *Loomis v. Church,* 76 Idaho 87, 277 P.2d 561 (1954), would protect Buckskin from any sharp dealing or revision of Resolution 11-6 by the County. "Judicial estoppel 'precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.'" *Heinze v. Bauer*, 145 Idaho 232, 235, 178 P.3d 597, 600 (2008) (quoting *McKay v. Owens*, 130 Idaho 148, 152, 937 P.2d 1222, 1226 (1997)). In this matter, counsel for the County

---

[9] Finding Buckskin's claim for declaratory relief moot does not leave Buckskin without the ability to redress a violation of Resolution 11-6 in future phases. If the County were to act inconsistently with the assurance provided in the Resolution, Buckskin could seek judicial review under LLUPA. That is, if the County tried to impose a traffic impact fee or require Buckskin to pay one as a condition for approval of the granting of a subdivision permit for any of the last three phases of The Meadows, Buckskin could seek judicial review under I.C. §§ 67-6519 or 67-6521.

ardently expressed at oral argument that Resolution 11-6 would not be rescinded and that the County had no intention of enforcing the provision of the CCA requiring the payment of compensation for future phases. These representations aided the County in its argument for finding Buckskin's claim for declaratory relief moot and a subsequent inconsistent position would violate the doctrine of judicial estoppel.

### F.      Buckskin has not asserted a contract claim.

In its initial summary judgment decision, the district court addressed an argument by Buckskin that the five-year limitations period in I.C. § 5-216 should be applied because its claim arose out of a contract. The Court stated:

> [Buckskin] also argued that this action is subject to a five-year statute of limitations based on I.C. § 5-216. However, this is not an action for breach of contract. Furthermore, there is no evidence in the record before the Court that the contract between the Plaintiffs and defendant was ever breached.

The statute of limitations argument has been mooted by this Court's determination regarding the inverse condemnation claim. However, it is mentioned in passing because of the contention by Buckskin that its claim arises out of a contract. Buckskin makes no allegation that it is seeking to enforce either the CCA or the RDA or that either agreement was breached. Rather, the contention is that the contracts are illegal, being impact fees that were levied in violation of IDIFA. As we have stated above, that is not the case. Even if that were the case, I.C. § 5-216 would not apply.

### G.      The district court did not abuse its discretion by denying the County's petition for attorney fees.

At the district court, the County argued that it was entitled to attorney fees under I.C. §§ 12-117 and 12-121. The court denied the County's claim because it found that neither party acted frivolously or without a reasonable basis in law or fact. The court stated:

> Both parties spent a significant amount of time briefing the statute of limitations issue and it was not clear from the outset of litigation exactly when the statute of limitations began to run. Although the court ultimately determined under the summary judgment standard that October 25, 2004 was the latest possible date when the statute of limitations could have started to run, there was a legitimate issue of law that was in dispute.

Now, on cross-appeal, the County seeks a reversal of the district court's denial. The County claims that it was entitled to attorney fees under both I.C. §§ 12-117 and 12-121 because Buckskin pursued this case in defiance of settled authority.

15

In response, Buckskin sets forth two arguments. First, Buckskin contends that the County does not provide adequate support for its claim and fails to distinguish between its claim for a reversal of the district court's denial and its request for fees on appeal. Second, Buckskin argues that, if the County's briefing is sufficient, the district court properly denied the County's petition for fees.

### 1. The County's briefing was sufficient.

Section X of the County's initial brief addresses attorney fees. The heading vaguely states, "the County is entitled to attorney fees; Buckskin is not." The County then discusses both I.C. §§ 12-117 and 12-121 and applies them to the facts of the case. No overt mention is made by the County in Section X that it is both arguing for fees on appeal and challenging the district court's denial of fees below. However, the County clearly indicates that is challenging the district court's denial of fees earlier in its briefing by stating that it "seeks reversal of the denial of attorney fees by the district court and also fees on appeal." Thus, we find that the County's briefing was sufficient for this Court to address whether the district court erred by denying the County's petition.

### 2. The district court did not abuse its discretion in denying the County's petition for attorney fees.

The district court denied the County's petition for attorney fees under I.C. §§ 12-117 and 12-121 on the grounds that Buckskin had not frivolously pursued its case or acted without a reasonable basis in fact and law. It should first be noted that I.C. § 12-121 does not apply in this case because where I.C. § 12-117 applies, as it does in this case, it is the sole means for awarding attorney fees. *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 148 Idaho 630, 635, 226 P.3d 1277, 1282 (2010). This Court reviews a district court's denial of attorney fees under I.C. § 12-117 for an abuse of discretion. *City of Osburn v. Randel*, 152 Idaho 906, 908, 277 P.3d 353, 355 (2012). Where the district court "act[s] within the bounds of its discretion and reache[s] its decision through an exercise of reason" an abuse of discretion will not be found. *Id*. at 910, 277 P.3d at 357. The district court carefully considered whether attorney fees were warranted below and did not act outside the bounds of its authority. Thus, the court did not abuse its discretion in denying the County's petition for fees under I.C. § 12-117, after finding that Buckskin did not act frivolously or without a reasonable basis in law of fact.

**H.     Neither party is entitled to attorney fees on appeal.**

Both parties assert that they are entitled to attorney fees on appeal under I.C. § 12-117. Idaho Code § 12-117 governs proceedings involving, as adverse parties, a political subdivision and a person and provides that a court shall award the prevailing party reasonable attorney fees "if it finds that the nonprevailing party acted without a reasonable basis in fact or law." I.C. § 12-117. The Court employs a two-part test to determine if  I.C. § 12-117 is invoked on appeal: (1) the party seeking fees must be the prevailing party and (2) the nonprevailing party must have acted without a reasonable basis in fact or law. *Osburn*, 152 Idaho at 910, 277 P.3d at 357.

On appeal, all issues raised by Buckskin have been resolved in favor of the County. However, the issue raised by the County in its cross-appeal has been resolved in favor of Buckskin. Therefore, neither party prevailed on appeal and we decline to award attorney fees on appeal.

## IV.
## CONCLUSION

We affirm the district court's judgment in favor of the County.

Chief Justice BURDICK, and Justices EISMANN, W. JONES and HORTON CONCUR.